**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| In re Colton and Stephnie Osborn, et al.,[1] | ) | Case No. 24-40202 |
| | ) | |
| Debtors. | ) | Chapter 12 |

## DEBTORS' EMERGENCY MOTION FOR ORDERS (I) AUTHORIZING POSTPETITION FINANCING; (II) GRANTING LIENS TO POSTPETITION LENDER; AND (III) SCHEDULING FINAL HEARING

COME NOW, Colton and Stephanie Osborn, C&S Ag, LLC, and C&S Organics, LLC (collectively, the "Debtors"), as Debtors and Debtors in possession in the above-captioned chapter 12 cases (collectively, the "Chapter 12 Cases"), seeking entry of interim and final orders under sections 105, 361, 364(c)(3) and 364(d)(1) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1 of the Nebraska Rules of Bankruptcy Procedure (the "Local Rules"): (a) authorizing, but not directing, Debtors to obtain postpetition financing on the terms set forth herein and (b) scheduling a final hearing on the Motion. In support of this motion (the "Motion"), Debtors respectfully represent the following:

### JURISDICTION AND VENUE

1. On March 8, 2024, (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 12 of the Bankruptcy Code. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. By Nebraska General Rule 1.5 of the United States District Court for the District of Nebraska, the District Court has referred all bankruptcy cases to the Bankruptcy Court for initial determination, as permitted by 28 U.S.C. § 157(a). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O), and Debtors consent to entry of a final order by the Court in connection with this Application to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

### SUMMARY OF REQUESTED RELIEF

2. Debtors own and manage a family farming operation primarily located in Dawson County, Nebraska, consisting of organic and non-organic crops farmed on thousands of acres of land, both owned and leased by Debtors.

3. As with many farming operations, Debtors require an operating loan for the upcoming crop season to cover land rents, crop inputs, planting and harvesting expenses, and general farming operations. Prior to the 2023 crop season, Debtors had obtained annual loans from FarmOp Capital, LLC / FarmOp Financial ("Farm Op"). When the 2023 crop season was approaching, Debtors were informed by FarmOp that it would not issue a loan to Debtors. As a result, Debtors obtained financing through Ag Resource Management ("ARM") for the 2023 crop season. This required an intercreditor subordination agreement in which FarmOp agreed, subject to certain conditions, to subordinate its lien position to ARM for the 2023 crop season.

---

[1] C&S Ag, LLC - Tax I.D. No. 83-4452293, C&S Organics, LLC – Tax I.D. No. 83-4444315, and Colton and Stephanie Orborn.

IN THE MATTER OF
Colton and Stephnie Osborn, et al.
Case No. BK 24-40202
Motion to Borrow

4.   Following the 2023 crop season, Debtors once again required an operating loan and again ARM was willing to provide such a loan, provided that FarmOp once again enter into an intercreditor subordination agreement in which FarmOp would agree to subordinate its lien position to ARM for the 2024 crop season. Negotiations persisted for several months which resulted in either a breakdown of communications or miscommunications as to what FarmOp would require from Debtors to once again subordinate its position to ARM.   Indeed, up to the week before the filing of these Chapter 12 Cases, conversations with ARM and FarmOp were ongoing.  Ultimately, however, financial pressures from other creditors, the need to make land lease payments, the impending crop season, and ongoing fees and interests on balances owed to FarmOp necessitated these instant cases to: (i) allow Debtors to obtain financing; (ii) allow Debtors relief from pending lawsuits and financial issues; and (iii) fix the claims against Debtors as of the Petition Date.

5.   The relief sought in this Motion is critical to ensure that Debtors are able to pay ordinary business expenses during the pendency of these Chapter 12 Cases, farm for the 2024 season, and, ultimately, reorganize as a going concern.  Absent the ability to obtain DIP Financing on the terms set forth herein, Debtors may be forced to cease operating, in which case their assets and the bankruptcy estates will be irreparably harmed to the detriment of not only the Debtors, but also all of their creditors.

6.   ARM, Debtors' senior secured creditor lender for the 2023 crop season, has agreed to support Debtors' Chapter 12 Cases so that Debtors may reorganize and maximize value for all creditors and parties in interest.  Specifically, ARM has agreed to provide up to $2,600,614.00 (plus 10% under certain circumstance) in a senior secured Debtors-in-possession credit facility (the "ARM DIP Loan"), which will be made available to Debtors upon the entry of the Interim DIP Order.  The ARM DIP Loan will be secured by:

a.   A first position lien of the assets described in DIP Loan Agreements, including:

i.   any and all of Debtors' present and future rights, title, and interest, now existing or hereafter arising, in and to farm products consisting of harvested or unharvested crops grown, to be grown, or growing;

ii.   any and all of Debtors' present and future rights, title and interest in and to, now existing or hereafter arising: chemicals and fertilizers;

iii.   any and all of Debtors' present and future rights, title and interest in all inventory of every type and description, whether now existing or hereafter arising or existing;

iv.   any and all of Debtors' present and future rights, title and interest in and to, now existing or hereafter arising, crop insurance;

v.   any and all of Debtor's present and future rights, title and interest in and to, now existing or hereafter arising, government farm program payments whether in cash or in kind; and

vi.   all Debtors' rights under insurance policies of any kind or nature relating to, insuring, or otherwise covering any of the foregoing;

vii.   all Debtors' books, records, files, computer disks, and software relating in any way to the foregoing; and

viii.   all of Debtors' accounts, general intangibles, payment intangibles, tangible chattel paper, electronic chattel paper, letter-of-credit rights, instruments, supporting obligations, documents, documents of title, warehouse receipts, bills of lading, inventory, equipment, farm products, and goods, in each case, constituting proceeds or products (manufactured or otherwise) of the of the foregoing, and all products and proceeds of the of the foregoing; and

IN THE MATTER OF
Colton and Stephnie Osborn, et al.
Case No. BK 24-40202
Motion to Borrow

  ix. in Debtors' present and future rights, title, and interest in and to all equipment of every type and description, whether now existing or hereafter arising or existing and together with all additions thereto and all substitutions or replacements therefor, and all accessories, attachments, and accessions thereto, that is and would be subject and inferior to prior perfected liens in the same collateral.

(collectively the a(i)-(ix) above the "DIP Loan Collateral").

7. Debtors believe that they are unable to obtain any other postpetition financing on terms more favorable than the DIP Loans. As a failure to secure financing would effectively mean the end of these Chapter 12 Cases, Debtors request that the Court grant the relief requested.

## PROPOSED DIP LOAN SUMMARY

8. Attached hereto as Exhibit A is a summary of the proposed DIP Loan and draft DIP Loan documents (the "DIP Loan Agreements") as described herein.

## RELIEF REQUESTED

9. By this Motion, Debtors request entry of interim order:

  a. authorizing Debtors to obtains postpetition financing in the form of the DIP Loan on the terms set forth herein and, more fully, in the DIP Loan Agreements; and

  b. pursuant to Bankruptcy Rule 4001, schedule, no earlier than 14 days from the entry of the Interim DIP Order, a hearing (the "Final Hearing") for this Court to consider entry of a final order authorizing the DIP Loan, as set forth in this Motion.

10. Debtors focused their efforts on negotiating the best possible debtor-in-possession financing facility with ARM. As a result of these efforts, Debtors was able to secure the ARM DIP Loan on economic terms comparable to those offered by ARM prior to Debtors' bankruptcy filing. Debtors reasonably believe that the DIP Loans provide the best possible financing available and, if financing is not received, Debtors will be unable to proceed in these Chapter 12 Cases.

## BASIS FOR RELIEF

11. Approval of the DIP Loans will provide Debtors with additional operating cash such that it will be able to avoid: (a) irreparable harm to Debtors' businesses; (b) depletion of going concern value; and (c) jeopardizing Debtors' ability to reorganize and maximize value. Accordingly, the timely approval of the relief requested herein on an interim basis is imperative.

12. The Court should authorize Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Agreements and obtain access to the DIP Loans. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances that are present in this Chapter 11 Case, as discussed herein. Courts grant a debtors-in-possession considerable deference when acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) ("Business judgments should be left to the board room and not to this Court"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D.

IN THE MATTER OF
Colton and Stephnie Osborn, et al.
Case No. BK 24-40202
Motion to Borrow

Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a Debtors in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

13. Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "… as long as the proposed action appears to enhance the debtor's estate." *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003) (citation omitted) (emphasis in original, text modifications removed); *see also In re AbitibiBowater*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy"). Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

14. Debtors' decision to move forward with the DIP Loans following an arms-length negotiation process is well within Debtors' sound business judgment. Specifically, and in the face of insufficient cash on hand, Debtors and its advisors determined that Debtors would require postpetition financing to support their operational and chapter 12 activities. Debtors negotiated the DIP Loan Agreements in good faith, at arms-length, and with the assistance of its advisors, and Debtors believe that they have obtained the best financing available. Accordingly, the Court should authorize Debtors' entry into the DIP Loan Agreements, as a reasonable exercise of Debtors' business judgment.

15. Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both Debtors and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

ARM DIP Loan

16. In exchange for the ARM DIP Loan, Debtors propose to provide ARM with, among other things, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on the DIP Loan Collateral pursuant to section 364(d) of the Bankruptcy Code.

17. Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate *already subject to a lien*, after notice and a hearing, where debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, Debtors may incur "priming" liens under a DIP Loans if either (a) the prepetition secured parties have consented or (b) prepetition secured parties' interests in the Collateral are adequately protected.

IN THE MATTER OF
Colton and Stephnie Osborn, et al.
Case No. BK 24-40202
Motion to Borrow

18. In order to obtain financing, secured by a priming lien pursuant to Section 364(d), Debtors "must demonstrate that no suitable alternative financing is available from other sources, and that the proposed financing arrangement adequately protects the existing lienholders's interests." *First Sec. Bank & Trust Co. v. Vegt*, 511 B.R. 567, (N.D. Iowa 2014).

19. As further noted by the Iowa District Court, the "first prong of § 364(d) requires Debtors to prove that alternative financing is unavailable…However, a debtor is not required to seek credit from every possible lender before concluding that such credit is unavailable. Rather, a debtor need only show that it has made reasonable efforts to seek other sources of credit." *First Sec. Bank & Trust Co. v. Vegt*, 511 B.R. 567, (N.D. Iowa 2014), *internal citations omitted. See also Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area).

20. As to the issue of adequate protection, which is governed by 11 U.S.C. §1205, Debtors believe that no entity has or can have a lien or interest in the DIP Loan Collateral and hence no adequate protection is due for the relief requested herein. *See In re Olsen*, 87 B.R. 148, 152-54 (Bankr. D. Colo. 1988) ("Based on Section 552, the Court concludes that crops have not been expressly made an exception to the rule that after-acquired property is free of prepetition lien claims. Congress could easily have specifically allowed crops to be excluded from the impact of Section 552(a) if it wanted to do so. It did not do so. This Court simply believes that Section 552(a) is intended to and constitutes a termination of a prepetition lien creditor's claim in new, postpetition crops…In this Court's opinion, the result is almost inescapable: that new crops are free of the prepetition secured creditor's claim."); *See also In re Beck*, 61 B.R. 671, 673 (Bankr. D. Neb. 1985) ("It is clear from § 552(a) that a security interest does not attach to a crop planted after the commencement of the case.").

## THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS

21. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit Debtors to: (i) grant the security interests, liens and superpriority claims, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the ARM to exercise, upon the occurrence of and during the continuance of an event of default, all rights and remedies under the ARM DIP Loan; and (iii) implement the terms of the proposed DIP Order.

22. Stay modifications of this kind are ordinary and standard features of post-petition Debtors financing facilities and, in Debtors' business judgment, are reasonable and fair under the present circumstances.

## REQUEST FOR FINAL HEARING

23. Emergency relief is warranted under these circumstances. Absent the immediate relief requested herein, Debtors may not be able to operate in the ordinary course of business.

24. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

IN THE MATTER OF
Colton and Stephnie Osborn, et al.
Case No. BK 24-40202
Motion to Borrow

## **CONCLUSION**

WHEREFORE, Debtors respectfully request that the Court enter an order: (i) granting this Motion on an interim basis; (ii) setting the matter for a final hearing on an expedited basis; (iii) in substantially the same form as is attached hereto as Exhibit B; and (iv) granting any other relief at equity or law this Court deems necessary.

Respectfully submitted,

**Colton and Stephnie Osborn et al., Debtors.**

By:     _/s/ Patrick R. Turner_
TURNER LEGAL GROUP, LLC
Patrick Turner (NE Bar No. 23461)
14707 California Street, #1
Omaha, Nebraska 68154
Telephone: (402) 690-3675
pturner@turnerlegalomaha.com

Proposed Counsel for Debtors.



<span style="color:blue">EXHIBIT A</span>

420 Throckmorton Street, Suite 1100 | Fort Worth, TX 76102

## 2024 Crop Year Operating Loan
## Conditional Term Sheet for Borrower in Bankruptcy

This term sheet is being provided as an accommodation to the listed Applicants for the purpose of obtaining bankruptcy court approval to incur secured debt on the following general terms and additional terms set forth in Lender's standard loan documents. This term sheet assumes no material adverse changes to the Applicant's planned farming operation or financial condition compared to the documents and information provided to the Lender. **This term sheet is not a commitment to lend.**

| | |
|---|---|
| **Loan Applicant(s)/Borrower(s):** | 13508<br>Colton and Stephanie Osborn |
| **Lender:** | Ag Resource Management |
| **Loan Type:** | 2024 Line of Credit |
| **ARM Loan Terms:**[*] | Total Initial Commit: $2,600,614<br>Conditional Commitment:<br>Distributor Conditional Commitment:<br>Maturity Date: 3-1-25<br>Interest Rate†: 13.1<br>Default Interest Rate: 6% add-on over base rate<br>Loan Origination Fee:1.5%<br>Loan Servicing Fee:1.5% |
| **Distributor (if Ag-Input):** | Becks Superior Hybrids |
| **Distributor Loan Terms (if Ag-Input):** | 13.1% |
| **Collateral:** | As described in Exhibit A to the Security Agreement, including present and future rights, title to and interest in now existing or hereafter arising crops and farm products and any and all proceeds of said crops and farm products, including but not limited to sales proceeds, insurance claims and indemnity payments, FSA and government farm program payments, and |

---

[*] **These Loan Terms are not a commitment to lend, and until the proposed loan is approved by the bankruptcy court and closed, the conditional loan commitment, interest rate, terms, and conditions are subject to change. Additionally, the maturity date may be extended by written and signed agreement between the borrower and lender and may be subject to additional interest and/or fee(s) at the time of extension.**

[†] **Due to potential fluctuations in the interest rate environment, this interest rate is subject to change until the proposed loan is closed.**

**ARM**™ **Let's grow.**

**AG RESOURCE MANAGEMENT**

*420 Throckmorton Street, Suite 1100 | Fort Worth, TX 76102*

|  | documents of title, scale tickets, warehouse receipts, and bills of lading. |
|---|---|
| **Additional Loan Approval Conditions** | <ul><li>Completed Loan Application and Supporting Documentation</li><li>Demand Promissory Note</li><li>Guaranty (if applicable)</li><li>Commercial Loan Agreement</li><li>Security Agreement</li><li>Distributor Note, Guaranty, Security Agreement (if applicable)</li><li>UCC(s)</li><li>Assignment of Indemnity (Crop insurance)</li><li>CCC-36 Assignment of Payment (FSA)</li><li>Borrower Summary</li><li>Bankruptcy court approval</li></ul> |
| **Bankruptcy Order Requirements‡** | <ul><li>Grant senior first lien position on Collateral pursuant to Section 364(c) or (d), as applicable.</li></ul><ul><li>Grant authority and pre-approval to increase original principal amount of the Loan by <u>10</u>% in the event such further extension of credit is necessary to continue or desirable to enhance farming operations in the ordinary course of Debtor's business.  Debtor's eligibility for an operating line increase is not guaranteed, and is subject to ARM's customary underwriting criteria. Mid-season operating line increases are sometimes necessary to address added acreage, or to cover increased or unplanned operating expenses common in the agricultural sector.</li></ul><ul><li>In the event that the proceeds from the Collateral are insufficient to pay all sums advanced by ARM in full, then ARM shall have an administrative expense claim in accordance with Section 364(c)(1), of the kind having priority over each administrative expense of the kind specified in Section 503(b) and Section 507(b).</li></ul><ul><li>The Order and the relief requested thereunder shall survive entry of any Order modifying any plan, converting the case to a different chapter under the United States Bankruptcy</li></ul> |

---

‡ Provided the Motion sets forth these requirements, it is permissible for the Order to approve the relief requested in the Motion by reference in lieu of the Order including this language.



420 Throckmorton Street, Suite 1100 | Fort Worth, TX 76102

Code, or dismissing this case, and the priority in payment, lien and security interest of ARM and/or assignee shall continue in full force and effect in this and any superseding case and/or subsequent to dismissal.

- Vacate and modify automatic stay otherwise applicable to ARM, if any, without the necessity of further application or motion to, or order of, the Court, so that: (i) Debtor may incur the liabilities, obligations, and liens contemplated by the loan documents and such additional extension of credit as may be necessary to plant, cultivate, or harvest 2023 crops in the ordinary course of business; (ii) Debtor may execute the ARM loan documents and any other documents reasonably necessary to pledge the collateral securing the Loan, including assignments of indemnity for crop insurance and assignments of payment for government payments; (iii) ARM may implement all of the terms, rights, and provisions granted by the loan documents, including performing all acts to assure the perfection and first priority of its liens against the collateral, including providing notice to buyers as provided by 7 U.S.C. § 1631; and (iv) ARM shall be immediately entitled to exercise all of its rights and remedies in respect of the collateral and default interest upon and after the occurrence of the earlier of the Maturity Date or an uncured Event of Default, as defined in the loan documents.

Attachments (sample loan document set):

Demand Note
Commercial Loan Agreement
Security Agreement

Please direct any legal inquiries to ARM Corporate Counsel:

*/s/ Kate Reid*
**KATE REID** | *Corporate Counsel*
(972) 369-2732 | Mobile
kreid@armlend.com

Note: signature pages have been deleted for brevity

## DEMAND PROMISSORY NOTE
### (Agricultural - Draw)

**DATE AND BORROWERS.** This Demand Promissory Note is dated _____ and is made by _____ _____ _____

(each and all of such Persons, singularly and jointly and severally, "**Borrower**"). Each Person signing this Demand Note as a "Borrower" shall be a Borrower hereunder and shall be liable with respect to the Obligations on a joint and several basis with each other Borrower and each other Credit Party. Use of the singular "Borrower" shall mean and refer to each Borrower, singularly or collectively, as the context may require.

1. **DEFINITIONS.** Capitalized terms used, but not defined herein, shall have the meanings given such terms under the Loan Agreement (as defined below). In addition to any other terms defined herein, the following terms, as used herein, shall have the following meanings:

   A. **Demand Note.** Demand Note means this Demand Promissory Note, as the same may be amended, restated, supplemented, or otherwise modified or replaced or substituted from time to time.

   B. **Holder.** Holder means Lender or any other Person or Persons having an interest in this Demand Note or any of the indebtedness evidenced hereby.

   C. **Interest Rate.** Interest Rate means _____ % per annum.

   D. **Lender.** Lender means Agrifund, LLC, a Delaware limited liability company.

   E. **Maturity Date.** Maturity Date means _____ .

   F. **Loan Agreement.** Loan Agreement means that certain Commercial Loan Agreement dated as of _____ by and between Lender and Borrower, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

   G. **Stated Principal Amount.** Stated Principal Amount means $ _____ .

2. **PROMISE TO PAY.** For value received, Borrower promises to pay to the order of Holder amounts advanced from time to time under the terms of this Demand Note and the other Loan Documents up to the Stated Principal Amount or such other amount as may be owing by Borrower to Holder under the Loan Documents (the "**Principal**"), plus interest from the date of disbursement, on the unpaid outstanding Principal balance until this Demand Note is paid in full.

3. **INTEREST.** Interest will accrue on the unpaid Principal balance of this Demand Note at the Interest Rate.

   A. **Interest After Default.** At any time that any Event of Default exists the Interest Rate shall automatically and without notice to Borrower be increased by 6.00% per annum.

   B. **Maximum Interest Amount.** Any amount assessed or collected as interest under the terms of this Demand Note will be limited to the maximum lawful amount of interest allowed by applicable law. Amounts collected in excess of the maximum lawful amount will be applied first to the unpaid Principal balance. Any remainder will be refunded to Borrower or such other Person who might be lawfully entitled thereto.

   C. **Accrual.** Interest on this Demand Note shall be calculated on the basis of a year of 365 or 366 days, as applicable, for the actual number of days elapsed.

4. **PAYMENT. BORROWER ACKNOWLEDGES AND AGREES THAT THE OBLIGATIONS EVIDENCED BY THIS DEMAND NOTE ARE DUE AND PAYABLE ON DEMAND AND THAT HOLDER MAY MAKE DEMAND FOR PAYMENT OF SUCH OBLIGATIONS AT ANY TIME, WITH OR WITHOUT THE OCCURRENCE OF ANY OTHER FACT, CIRCUMSTANCE, OR CONTINGENCY AND FOR ANY REASON. BORROWER AGREES TO PAY ALL OBLIGATIONS ON THE EARLIER TO OCCUR OF (A) THE DATE ON WHICH HOLDER DEMANDS PAYMENT AND (B) THE MATURITY DATE.** If any payment is due on a date which is not a Business Day, then such payment shall be due on the immediately following Business Day.

5. **PREPAYMENT.** Borrower may prepay the Loan in full or in part at any time, without premium or penalty.

6. **SECURITY.** The Obligations under this Demand Note and all other Obligations are secured by the Security Documents.

7. **COLLECTION EXPENSES.** If this Demand Note is placed in the hands of an attorney for collection following the occurrence of an Event of Default, Borrower agrees to pay to Lender upon demand all costs and expenses, including, without limitation, all reasonable attorneys' fees and court costs incurred by Lender in connection with the enforcement or collection of this Demand Note (whether or not any action has been commenced by Lender to enforce or collect this Note) or in successfully defending any counterclaim or other legal proceeding brought by Borrower contesting Lender's right to collect the outstanding Principal and all other sums due hereunder. All of such costs and expenses shall bear interest at the higher of the rate of interest provided herein or any default rate of interest provided herein, from the date of payment by Lender until repaid in full.

8. **WAIVERS AND CONSENT BY BORROWER.** To the maximum extent permitted by law, Borrower waives demand, presentment for payment, protest and notice of intent to accelerate, of acceleration, of non-payment, of dishonor and any and all other defenses to payment (other than the defense of Payment in Full) of this Demand Note. Lender, without

notice to or further consent of Borrower or any other Credit Party and without in any respect compromising, impairing, releasing, lessening or affecting the obligations of Borrower hereunder or under any of the Loan Documents, may: (a) release, surrender, waive, add, substitute, settle, exchange, compromise, modify, extend or grant indulgences with respect to (i) this Demand Note, (ii) any of the other Loan Documents, (iii) all or any part of any collateral or security for this Demand Note and/or (iv) any other Credit Party; (b) complete any blank space in this Demand Note according to the terms upon which the loan evidenced hereby is made; and (c) grant any extension or other postponements of the time of payment hereof.  In addition, Borrower waives the benefit of any applicable valuation and appraisement laws. Borrower specifically waives (a) all defenses based upon suretyship or impairment of collateral, and (b) any defenses which Borrower may assert on the underlying debt, including but not limited to failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, lack of legal capacity, statute of limitations, lender liability, accord and satisfaction, and usury.

9.   **NO WAIVER.**  No failure or delay on the part of any Holder to exercise any right under this Demand Note or any other Loan Document or under applicable law shall operate as a waiver hereof or thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

10.   **SUCCESSORS AND ASSIGNS.**   This Demand Note shall be binding upon Borrower and Borrower's legal representatives, administrators, heirs and executors, and successors and assigns and shall inure to the benefit of Holder and its successors and assigns.  Borrower may not assign any of its rights or obligations under this Demand Note or the other Loan Documents.  Lender may assign all or any portion of its rights under this Demand Note or the other Loan Documents.  Lender may disclose to any actual or potential assignee any information Borrower has delivered to Lender in connection with this Demand Note or the other Loan Documents.

11.   **EFFECT OF SIGNATURES.**  By signing, Borrower agrees to the terms set forth in this Demand Note and certifies that Borrower has received a copy of this Demand Note and that it has completely read and understands this Demand Note.

**IN WITNESS WHEREOF**, each Borrower has executed and delivered this Demand Note as of the date first above written:



## SECURITY AGREEMENT

**DATE AND PARTIES.** This Security Agreement is dated as of _____ and is by and between or among AGRIFUND, LLC, a Delaware limited liability company ("Lender"), and _____
_____
_____
_____
each of the Persons party hereto as a "Debtor" (each and all of such Persons, singularly and jointly and severally, **Debtor**").

1. **DEFINITIONS AND RELATED TERMS.**  Capitalized terms used, but not defined herein, shall have the meanings given such terms under the Loan Agreement (as defined below).  In addition to any other terms defined herein, the following terms, as used herein, shall have the following meanings:

    A. **Agreement.**  Agreement means this Security Agreement, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

    B. **Collateral.**  Collateral means all of the property described on Exhibit A, attached hereto and made a part hereof.

    C. **Cross-Collateralization Agreement.**  Cross-Collateralization Agreement means any now existing or hereafter arising cross-collateralization agreement or similar instrument executed and delivered by Debtor in favor of Lender, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

    D. **Loan Agreement.**  Loan Agreement means that certain Commercial Loan Agreement dated as of the date hereof by and between Lender and Borrower, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

    E. **Secured Obligations.**  Secured Obligations means all obligations arising out of or related to this Agreement, the Loan Agreement, the Cross-Collateralization Agreement and any other duties or obligations owed by Debtor to Lender.

    F. **Payment in Full.**  Payment in Full means the full and final payment in cash and performance of any and all Secured Obligations.

    G. **UCC.**  UCC means the Uniform Commercial Code as adopted and incorporated in the laws of the state or other jurisdiction which govern or apply to this Agreement.

2. **RULES OF CONSTRUCTION.**

    A. **Multiple Debtors.**  Each Person signing this Agreement as a "Debtor" shall be a Debtor hereunder and shall be liable with respect to the Secured Obligations on a joint and several basis with each other Debtor and each other Credit Party.  Use of the singular "Debtor" shall mean and refer to each Debtor, singularly or collectively, as the context may require.

3. **GRANT OF SECURITY INTEREST.**  To secure the full and final payment and performance of all Secured Obligations, Debtor hereby grants Lender a security interest in the Collateral.  The security interest granted in this Agreement to Lender shall continue until the earlier to occur of termination of this Agreement in a writing signed by Lender and Payment in Full.

4. **WARRANTIES AND REPRESENTATIONS.**  Debtor makes to Lender the following warranties and representations which will continue as long as this Agreement is in effect:

    A. **Power.**  Each Debtor is organized, validly existing, qualified, and in good standing in each jurisdiction in which it operates.  Each Debtor has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder, including, without limitation, to grant Liens on its property as provided in this Agreement.  Each Debtor has the power and authority to carry on its business and activities as they are now being conducted.

    B. **Authority**.  The execution and delivery of this Agreement by each Debtor, as applicable, and each Debtor's performance of its obligations under this Agreement have been duly authorized by all requisite action, have received all necessary governmental approval, will not violate any provision of law or order of any court or government or authority, and will not violate any agreement to which such Debtor is a party or to which such Debtor or any of its property is subject.

    C. **Title**.  The Debtor has bona fide and exclusive title to all Collateral, and the Collateral is free and clear of any liens, claims or encumbrances, whether voluntary or by operation of law, including without limitation, agricultural liens, breeders liens, veterinary liens, livestock production input liens, feeder's liens, and production money security liens.

5. **FINANCING STATEMENTS; FIXTURE FILINGS; ADDITIONAL FILINGS; POWER OF ATTORNEY.**  Debtor authorizes Lender to file any financing statements, fixture filings, notices under the Food Security Act, and other filings or public records or notices relating to the perfection or better perfection or protection of Liens or other interests and amendments thereto relating to Debtor or the Collateral which Lender deems appropriate, in each case, in form and substance required by Lender, and to (a) describe the Collateral in the manner determined by Lender and (b) include therein all other information which is required or which Lender believes is required by the laws of any applicable jurisdiction (including Article 9 of the UCC as enacted in any jurisdiction) with respect to the preparation or filing thereof.  Debtor appoints Lender as its attorney-in-fact to perform all acts which Lender deems appropriate to perfect and to continue perfection of the Lien granted to Lender under this Agreement or any other Loan Document to which Debtor is a party, including, without

limitation, (i) the filing of financing statements, fixture filings, notices under the Food Security Act, and other filings or public records or notices relating to the perfection or better perfection or protection of Liens and other interests and amendments thereto, (ii) the execution in Debtor's name of any agreements providing for control over any applicable Collateral, and (iii) the indorsement, presentation, and collection on behalf of Debtor and in Debtor's name of any checks, instruments, notes, or other documents, instruments, or agreements necessary or desirable to collect any amounts which Debtor may be owed, such power of attorney being coupled with an interest and is therefore irrevocable.

6. **FOOD SECURITY ACT.**  From time to time upon Lender's request, Debtor hereby agrees to provide Lender in writing the names, addresses, and other requested information regarding all buyers, commission merchants, or selling agents to or through which Debtor may sell or otherwise dispose of its farm products and related assets.  Debtor hereby authorizes Lender to notify all buyers, commission merchants, selling agents and others regarding Lender's Lien under this Agreement and the other Loan Documents; provided, however, that Lender shall have no obligation to provide or give such notice and the failure to provide or give such notice shall not in any way constitute a waiver of any provision of any Loan Document.

7. **INTELLECTUAL PROPERTY.**  Debtor grants Lender a non-exclusive license and right to use, without royalty or other charge, Debtor's intellectual and other property (including, without limitation, any licensed intellectual property, unless prohibited by the enforceable terms of such license) for purposes of advertising any Collateral for sale, collecting any accounts, disposing of or liquidating any Collateral, settling claims, or otherwise exercising any of its rights and remedies under the Loan Documents (including, without limitation, labels, patents, copyrights, trade secrets, trade names, trademarks, service marks, product line names, advertising materials, and any other property of a similar nature).  Debtor's rights under all licenses and all franchise agreements shall inure to Lender's benefit.  Debtor shall be liable for any and all expense incurred in connection with Lender's exercising its rights under this Agreement and the other Loan Documents to which Debtor is a party.

8. **ENTRY.**  Debtor (for itself and on behalf of its affiliates) irrevocably consents to any act by Lender or its agents in entering upon any premises for the purposes of either (a) inspecting any Collateral or (b) taking possession of any Collateral.  Debtor waives, as to Lender and its agents, any now existing or hereafter arising claim based upon trespass or any similar cause of action for entering upon any premises where Collateral may be located.

9. **OTHER RIGHTS.**  Without limiting Debtor's obligations under the this Agreement and the other Loan Documents, Debtor authorizes Lender from time to time (a) to (i) take from any party and hold additional collateral or guaranty for the payment of the Secured Obligations or any part thereof, (ii) exchange, enforce, or release such collateral or guaranty or any part thereof, and (iii) release or substitute any indorser or guarantor or any party who has granted Lender any security interest in any property as security for the payment of the Secured Obligations or any part thereof or any party in any way obligated to pay the Secured Obligations or any part thereof, and (b) during the existence of any Event of Default, to direct the manner of the disposition of the Collateral and the enforcement of any indorsements, guaranties, letters of credit, or other security or specified or supporting obligations relating to the Secured Obligations or any part thereof as Lender in its sole discretion may determine.

10. **ACCOUNTS; OTHER COLLATERAL.**  Before or after an Event of Default, Lender may contact any Account Debtor or other Person obligated on any Collateral to (i) verify any instructions which may be given with respect to the payment of such Account, (ii) notify such Account Debtor or Person of the existence of Lender's Liens under the Loan Documents, and (iii) notify such Account Debtor or Person to make payment on Debtor's Accounts which constitute Collateral directly to Lender or in accordance with Lender's directions.

11. **WAIVER OF MARSHALING.**  Debtor hereby waives any right it may have to require marshaling of its assets.

12. **CONTROL; FURTHER ASSURANCES.**  Debtor will, at its expense, cooperate with Lender from time to time in (a) obtaining control of, or control agreements with respect to, Collateral for which control or a control agreement is required or is an available method for perfection of Lender's security interest under the UCC and (b) perfecting or better perfecting or protecting Lender's security interests in the Collateral by any one or more methods of perfection and protection requested by Lender.  If any of the Collateral comprises chattel paper or instruments, Debtor will mark such chattel paper and instruments on the face thereof with a statement that such chattel paper and instrument is subject to Lender's security interest and, if requested by Lender, deliver such chattel paper and instruments to Lender's possession.

13. **AUTHORITY TO PERFORM.**  Debtor authorizes Lender to do anything it deems necessary to protect the Collateral, including, without limitation:

   A.  Pay and discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral.

   B.  Pay any rents or other charges under any lease affecting the Collateral.

   C.  Order and pay for the repair, maintenance, and preservation of the Collateral.

   D.  File any financing statements on Debtor's or Lender's behalf and pay for filing and recording fees pertaining to the Collateral.

   E.  Place a note on any chattel paper indicating Lender's interest in the Collateral.

   F.  Take any action Lender believes or deems necessary to realize on the Collateral, including, without limitation, performing any part of a contract or indorsing the same in Debtor's name.

   G.  Handle in Debtor's or Lender's name, any suits or other proceedings involving the Collateral (including, without limitation, entering into any settlement or related agreements).

H.  Prepare, file, and sign Debtor's name to any necessary reports or accountings.

I.  Making entries in Debtor's books and records showing the existence of  this Agreement and the other Loan Documents and the interests created herein or therein.

14. **REMEDIES.**  During the existence of any Event of Default, Lender may, in its sole and absolute discretion, exercise any and all remedies it may have, whether arising under statute or rule, by contract, or in equity, whether against Debtor or any other Credit Party or the Collateral, all of which shall be cumulative and may be exercised singly or cumulatively, at one time or from time to time, including, without limitation:

A.  Lender may exercise any or all of the rights, powers, privileges and remedies granted to a secured party under the UCC or otherwise provided by law;

B.  Lender may contact all Persons obligated to a Debtor on or with respect to any Collateral and to instruct such Persons to deliver all Collateral directly to Lender;

C.  Lender may sell, lease, license or otherwise dispose of any or all Collateral;

D.  Lender may notify the United States Postal Service to change the address for delivery of mail of Debtor to any address designated by Lender;

E.  Without notice to or consent by any Debtor or other Credit Party, and without the obligation to pay rent or other compensation, Lender may (but shall not be obligated to) take exclusive possession of all locations where any Debtor conducts it business or has any rights of possession and use such locations and any of all of Debtor's equipment (or any equipment in which Debtor has any right to use) to continue growing any crops which constitute Collateral to fruition, harvest any crops which constitute Collateral, store, process, manufacture, sell, use, and liquidate or otherwise dispose of Collateral and, in so doing, use and consume at Debtor's sole cost and expense, any and all fertilizers, fuel, chemicals, seed, bags, and other farm products to undertake the same;

F.  With regard to any deposit account which contains any Collateral or proceeds of any Collateral, Lender may instruct the bank maintaining such deposit account to pay the balance of such Deposit Account to Lender or take such other action as Lender shall instruct;

G.  With regard to any securities account or commodity account which contains any Collateral or proceeds of any Collateral, Lender may instruct the securities intermediary maintaining such securities account or the commodity intermediary maintaining such commodity account, as applicable, to pay the balance of such securities account or such commodity account, as applicable, to Lender or take such other action as Lender shall instruct;

H.  Without regard to the occurrence of waste or the adequacy of security, apply for the appointment of a receiver for any Debtor or for the assets of any Debtor and each Debtor waives any objection to such appointment or to the right to have a bond or security posted by Lender;

I.  Lender may apply the proceeds of Collateral to the Secured Obligations in whatever order Lender may determine;

J.  Lender may exercise all rights on behalf of Debtor under any agricultural lien or agricultural producers lien in favor of Debtor with respect to the Collateral; and

K.  Lender shall have the right but not the duty to exercise power of attorney with authority to act on behalf of Debtor as Debtor's attorney-in-fact, including without limitation the power to execute, deliver, and acknowledge any and all documents, instruments, and assignment to preserve, maintain, protect, perfect, transfer, or foreclose on the Collateral, to receive, endorse, and negotiate all checks, drafts, money orders or other instruments arising from the Collateral, and to compromise, defend, sue on, enforce, and reduce to money all rights and interests of the Debtor in the Collateral.

15. **CERTAIN RESTRICTIONS.**  While an Event of Default exists:

A.  Each Debtor will deliver to Lender from time to time, as requested by Lender, current lists of all Collateral and the location of such Collateral;

B.  No Debtor will dispose of any Collateral except on terms approved by Lender; and

C.  At Lender's request, each Debtor will assemble and deliver all Collateral and books and records pertaining thereto to Lender at a reasonably convenient place designated by Lender or in accordance with Lender's instructions.

16. **INDEMNIFICATION; REIMBURSEMENT OF EXPENSES.**  Debtor agrees to defend, protect, indemnify, and hold harmless Lender and its affiliates and all of their respective officers, directors, employees, attorneys, consultants, and agents from and against any and all losses, damages, liabilities, obligations, penalties, fines, taxes, fees, costs, and expenses (including, without limitation, attorneys' fees, costs and expenses; fees, costs and expenses for investigations, experts, and advisors; all filing and recording costs and fees, including any recordation, documentary or transfer taxes or stamps, that are required to be paid with respect to the Secured Obligations or any of the Loan Documents or the enforcement or protection of Lender's rights under the Loan Documents) incurred by or on behalf of such indemnitees, whether before or after the date of this Agreement, as a result of or arising from or in any way relating to the Loan Documents, the making of any Advance, the use of the proceeds of any Advance, or the transactions contemplated herein or in any other Loan Documents or the exercise of Lender's remedies hereunder or at law or in equity.  Debtor's obligations under this section shall be part of the Secured Obligations, shall be secured by the Collateral, and shall be due and payable by Debtor ON DEMAND.  Debtor' obligations under this section shall survive Payment in Full.

17. **APPLICABLE LAW; WAIVER OF JURY TRIAL.  THE APPLICABLE LAW AND WAIVER OF JURY TRIAL**

**PROVISIONS IN THE LOAN AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE IN THIS AGREEMENT.**

18. **SUCCESSORS AND ASSIGNS; AGENTS.**  This Agreement and each other Loan Document to which Debtor is a party shall be binding upon Debtor and Debtor's legal representatives, administrators, heirs and executors, and successors and assigns and shall inure to the benefit of Lender and its successors and assigns.  Debtor may not assign any of its rights or obligations under this Agreement or the other Loan Documents.  Lender may from time to time appoint one or more agents and subagents for purposes of perfecting on the Collateral and otherwise taking or accepting collateral assignments of rights otherwise stated to be granted to Lender hereunder or enforcing its rights hereunder.  Each of such agents and subagents shall be entitled to the same rights of indemnification and reimbursement of fees, costs, and expenses which are otherwise available to Lender under this Agreement and the other Loan Documents, all without further consent or acknowledgment of, or notice to, Debtor or any other Credit Party.

19. **AMENDMENT, INTEGRATION AND SEVERABILITY.**  This Agreement may not be amended or modified by oral agreement.  No amendment or modification of this Agreement is effective unless made in writing and signed by Debtor and Lender.  This Agreement and the other Loan Documents are the complete and final expression of the agreement between Lender and Debtor regarding the subject matter hereof and thereof. If any provision of this Agreement is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

20. **NOTICE.**  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing and shall be effective upon receipt by the noticed party.  Acceptable methods for giving notices hereunder shall include first-class U.S. mail, hand-delivery, and nationally recognized commercial courier service.  Regardless of the manner in which notice is provided, notices may be sent to the addresses for Lender and Debtor as set forth below the applicable party's signature to this Agreement or to such other address as any party may give to any of the others for such purpose in accordance with this Agreement.

21. **FURTHER ASSURANCES.**  Debtor agrees to sign, deliver, and file any additional documents, agreements, instruments, or certifications that Lender may consider necessary or desirable to perfect, continue, and preserve the Secured Obligations and Lender's rights with respect to the Collateral and to effect the transactions contemplated herein and in the other Loan Documents including, without limitation, assignments of milk checks to be delivered to any purchaser of Debtor's milk, if loan is granted for the purpose of growing dairy silage.

22. **CONFIDENTIALITY.**  Lender will endeavor to maintain the confidentiality of the information Lender or Lender's agents obtain with respect to Debtor, except that Lender may disclose such information (i) in any litigation, arbitration, or other proceeding involving any Credit Party, the Secured Obligations, or the Loan Documents; (ii) to any of Lender's affiliates; (iii) to any government or governmental or regulatory agency and any self-regulating authority; (iv) to Lender's accountants, auditors, counsel, and advisors; (v) to any of Lender's actual or prospective assignees or participants; (v) as may be required by court order or law, rule, or regulation; (vi) to the extent permitted or contemplated under any Loan Document; and (vii) to any other Person whom Lender reasonably believes to be a creditor of Debtor or any other Credit Party.

23. **NO WAIVER.**  No failure or delay on the part of Lender to exercise any right under this Agreement or any other Loan Document or under applicable law shall operate as a waiver hereof or thereof nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

24. **SURVIVAL OF CERTAIN TERMS.**  All representations and warranties made in this Agreement and the other Loan Documents shall survive the making of any Advance and the delivery of any other Loan Document and shall continue in full force and effect until Payment in Full.

25. **COUNTERPARTS; ELECTRONIC SIGNATURES.**  This Agreement and any amendments, waivers, or consents relating hereto may be executed in any number of counterparts and by different parties hereto or thereto in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which, when taken together, shall constitute but one and the same instrument.  Any signature delivered by a party hereto or to any amendment, waiver, or consent relating hereto by facsimile transmission or by electronic email in Adobe Corporation's Portable Document Format (or PDF) shall be deemed to be an original signature hereto.

26. **EFFECT OF SIGNATURES.**  By signing, Debtor agrees to the terms set forth in this Agreement and certifies that Debtor has received a copy of this Agreement and the other Loan Documents and that it has completely read and understands this Agreement.

**IN WITNESS WHEREOF**, Lender and each Debtor have executed and delivered this Agreement as of the date first above written:

**LENDER:**

**AGRIFUND, LLC**

**By:** _____

**Name:**

**Title:**

**Address for notices:**

420 Throckmorton Street, Suite 1100
Fort Worth, TX 76102



**EXHIBIT A**

**COLLATERAL**

FARM PRODUCTS (CROPS): Any and all of Debtor's present and future rights, title, and interest, now existing or hereafter arising, in and to farm products consisting of harvested or unharvested crops grown, to be grown, or growing, including, but not limited to, on the "Specified Real Property."

"Specified Real Property" includes, but is not limited to, the real property identified as follows:

FARM PRODUCTS (RELATED PROPERTY): Any and all of Debtor's present and future rights, title and interest in and to, now existing or hereafter arising: chemicals and fertilizers.

FARM PRODUCTS (SPECIFIED OTHER): Any and all of Debtor's present and future rights, title and interest in and to, now existing or hereafter arising: N/A

INVENTORY: Any and all of Debtor's present and future rights, title and interest in all inventory of every type and description, whether now existing or hereafter arising or existing.

EQUIPMENT: Any and all of Debtor's present and future rights, title, and interest in and to all equipment of every type and description, whether now existing or hereafter arising or existing and together with all additions thereto and all substitutions or replacements therefor, and all accessories, attachments, and accessions thereto.

CROP INSURANCE: Any and all of Debtor's present and future rights, title and interest in and to, now existing or hereafter arising, crop insurance.

GOVERNMENT PROGRAM PAYMENTS: Any and all of Debtor's present and future rights, title and interest in and to, now existing or hereafter arising, government farm program payments whether in cash or in kind.

(All of the forgoing hereinafter collectively referred to as the "**Collateral**")

Together with all rights under insurance policies of any kind or nature relating to, insuring, or otherwise covering any of the Collateral, including, without limitation, all rights to receive payments under any such insurance, whether such payments are made in respect of losses, refunds of premiums, or otherwise, in each case, whether now existing or hereafter arising;

All of Debtor's books, records, files, computer disks, and software relating in any way to the Collateral, and all rights that Debtor may have with regard thereto, in each case, whether now existing or hereafter arising; and

All of Debtor's accounts, general intangibles, payment intangibles, tangible chattel paper, electronic chattel paper, letter-of-credit rights, instruments, supporting obligations, documents, documents of title, warehouse receipts, bills of lading, inventory, equipment, farm products, and goods, in each case, constituting proceeds or products (manufactured or otherwise) of the Collateral or covering or relating to or in any manner any of the Collateral, and all products and proceeds of the Collateral.

EXCLUDED PROPERTY: Any of the foregoing to the contrary notwithstanding, the Collateral shall not include any of property described below:

a.      Farm products consisting, in any respect, of marijuana or any inventory consisting of marijuana (or any products manufactured from marijuana).

b.    Consumer goods.

c.    The following property (if any): N/A.



## Commercial Loan Agreement

**DATE AND PARTIES.** This Commercial Loan Agreement is dated _____ and is by and between or among AGRIFUND, LLC, a Delaware limited liability company ("**Lender**"), and

_____

_____

_____

(each and all of such Persons as defined below, singularly and jointly and severally, "**Borrower**").

1. **DEFINITIONS AND RELATED TERMS.** In addition to other terms defined in this Agreement, the following terms have the following meanings:

   A. **Advance.** Advance means each extension of credit made or deemed made by Lender to Borrower hereunder.

   B. **Agreement.** Agreement means this Commercial Loan Agreement, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

   C. **Application.** Application means each of the applications completed, executed, and delivered to Lender in connection with the transactions contemplated in this Agreement, including, without limitation, the Advances, in each case, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

   D. **Business Day.** Business Day means any day on which banks located in the Jurisdiction are not closed or permitted to be closed.

   E. **Credit Party.** Credit Party means each Borrower and each other Person which has guaranteed all or a portion of the Obligations or granted Lender a Lien in and to any or all of its assets and properties to secure any of the Obligations, and, in each case, each of such Person's successors and assigns.

   F. **Collateral.** Collateral means any property, real, personal, or intangible, that secures or is intended to secure the Obligations.

   G. **Demand Note.** Demand Note means that certain Demand Promissory Note dated the date hereof, made by Borrower to order of Lender, as the same may be amended, restated, supplemented, or otherwise modified or replaced or substituted from time to time.

   H. **Food Security Act.** Food Security Act means the Food Security Act of 1985, as amended from time to time.

   I. **Insiders.** Insiders means those defined as insiders by the United States Bankruptcy Code, as amended, and, in any event, includes, without limitation, any officer, employee, stockholder or member, director, partner, or any immediate family member of any of the foregoing or any person or entity which, directly or indirectly, controls, is controlled by or is under common control with Borrower.

   J. **Jurisdiction.** Jurisdiction means the State of Delaware.

   K. **Lien.** Lien means any lien, security interest, pledge, hypothecation, adverse claim, or other encumbrance.

   L. **Loan.** Loan means the indebtedness evidenced by the Demand Note and any other extension of credit made by Lender to Borrower.

   M. **Loan Documents.** Loan Documents means this Agreement and all other documents, instruments, and agreements evidencing any Advance or executed or delivered by any Credit Party in connection with this Agreement or any Advance, including, without limitation, any Application, the Demand Note, any Security Document, any cross-collateralization agreement, and any guarantee or pledge agreement in respect of any or all of the Obligations or any Collateral or otherwise, in each case, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

   N. **Loan Origination Fee.** Loan Origination Fee means a fee in the amount of $ _____.

   O. **Maturity Date.** Maturity Date means the "Maturity Date" as set forth in the Demand Note.

   P. **Obligations.** Obligations means any and all indebtedness, obligations, and liabilities of any kind or nature, whether now existing or hereafter arising, of Borrower to Lender, including without limitation, (I) all indebtedness, obligations, and liabilities arising under the Loan Documents; (ii) all other indebtedness, obligations, and liabilities arising under or in connection with any other transaction or arrangements between Borrower and Lender; (iii) any and all costs, expenses, fees (including reasonable attorney's fees and court costs), and other charges incurred from time to time by or on behalf of Lender or its affiliates in connection with the negotiation, execution and delivery, making, administering, maintaining, collecting, or enforcing the Loan Documents and/or any or all of the foregoing, in each of the foregoing cases, whether absolute or contingent, liquidated, voluntary or involuntary, determined or undetermined, due or to become due, and whether otherwise secured or unsecured, and whether Borrower is obligated alone or with other Person on a joint, several or solidary basis, as a principal obligor or as a surety, and whether or not any or all of the foregoing may be barred under any statute of limitations or prescriptive period, allowed or not allowed in any bankruptcy proceeding, or may be or become otherwise unenforceable or voidable for any reason whatsoever. Without limiting the generality of the foregoing, the term "Obligations" shall also include all debts, liabilities and obligations incurred by Borrower to Lender in any insolvency proceeding of Borrower or its estate and any interest, fees or other charges accrued in any such insolvency proceeding, whether or not any such interest, fees or other charges are recoverable from Borrower or its estate under 11 U.S.C. § 506.

**Q.   Payment in Full.**   Payment in Full means the full and final payment in cash and performance of any and all Obligations.

**R.   Permitted Liens.**   Permitted Liens means all Liens on any of the Collateral (I) which are in favor of Lender; (ii) which are nonconsensual and arise by law in the ordinary course of business for obligations which are not overdue or which are being contested in good faith by appropriate proceedings being pursued diligently and for which Borrower has implemented adequate reserves; (iii) which constitute valid purchase money security interests attaching only to the fixed or capital property purchased or improved with such purchase money; (iv) which are disclosed on the Application; (v) which are shown in the financial statements delivered to Lender as part of the application process and before the first Advance is made hereunder; and (vi) to which Lender shall have consented in writing.

**S.   Person.**   Person means any individual, corporation, limited liability company, partnership, trust, governmental entity or authority, association, or other entity.

**T.   Security Documents.**   Security Documents means any and all security agreements, pledge agreements, mortgages, deeds of trust, and other documents, agreements, and instruments creating or intending to create any security interest, mortgage, pledge, hypothecation, or lien in and on any Credit Party's Property as collateral security for any or all of the Obligations, in each case, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

**U.   Servicing Fee.**   Servicing Fee means a fee in the amount of $ _____.

**V.   Stated Principal Amount.**   Stated Principal Amount has the meaning given such term in the Demand Note.

**W.   UCC.**   UCC means the Uniform Commercial Code as enacted in the Jurisdiction or in any other applicable jurisdiction.

**X.   Additional UCC Terms.**   Any term used in this Agreement or in any financing statement filed in connection herewith which is defined in the UCC and not otherwise defined in this Agreement or in any other Loan Document shall have the meaning given to the term in the UCC, including, without limitation, Accession, Account Debtor, Chattel Paper, Account, Commercial Tort Claim, Deposit Account, Document, Electronic Chattel Paper, Equipment, Fixture, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Proceeds, Supporting Obligation, and Tangible Chattel Paper.

**2.   RULES OF CONSTRUCTION.**

**A.   Multiple Borrowers.**   Each Person signing this Agreement as a "Borrower" shall be a Borrower hereunder and shall be liable with respect to the Obligations on a joint and several basis with each other Borrower and each other Credit Party.   Use of the singular "Borrower" shall mean and refer to each Borrower, singularly or collectively, as the context may require.

**3.   ADVANCES.**   Advances under this Agreement are made according to the following terms and conditions:

**A.   DISCRETIONARY ADVANCES.   ANY OTHER TERM OR CONDITION OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT TO THE CONTRARY NOTWITHSTANDING, LENDER HAS NO OBLIGATION TO MAKE ANY ADVANCE TO BORROWER AND THE MAKING OF EACH ADVANCE BY LENDER TO BORROWER IS AT LENDER'S SOLE DISCRETION.   CONDITIONS PRECEDENT TO THE MAKING OF AN ADVANCE ARE INCLUDED IN THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS FOR THE SOLE PURPOSE OF ASSISTING LENDER IN DETERMINING WHETHER IT WILL MAKE AN ADVANCE AND BORROWER MAY NOT INFER THAT ANY ADVANCE WILL BE MADE SOLELY BECAUSE THE STATED CONDITIONS PRECEDENT TO THE MAKING OF SUCH ADVANCE HAVE BEEN SATISFIED.**

**B.   Making Advances.**   Subject to the terms and conditions set forth in this Agreement and the other Loan Documents, Lender may make the Loan to Borrower in one or more Advances; provided, however, that (I) Lender shall be under no obligation to make any Advance and (ii) unless Lender otherwise agrees, the aggregate original principal amount of all Advances made hereunder will not exceed the Stated Principal Amount.

**C.   Method of Making Advances.**   Advances will be made in any manner and at such times as are requested by Borrower and acceptable to Lender from time to time.

**D.   Reliance on Advance Requests.**   Lender may make an Advance based on any request which Lender believes to be made by or on behalf of Borrower.   Lender has no duty to inquire as to the identity of any Person making any request for an Advance hereunder.   Borrower will indemnify Lender and hold Lender harmless for Lender's reliance on any request for an Advance that Lender believes to be genuine and any such Advance shall constitute part of the Obligations.

**E.   Records.**   Lender's records shall be conclusive evidence as to the outstanding principal amount of all Advances and all interest accrued thereon.

**F.   Conditions Precedent.**   Lender shall have no obligation to make any advance to Borrower.   To the extent Lender elects to make an Advance, each of the following conditions shall have been satisfied (as determined by Lender in its sole discretion):

(1)   Discretion.   Lender shall have elected to make such Advance, in its sole and absolute discretion.

(2)   No Event of Default.   Each Credit Party shall be in compliance with all terms and conditions of this Agreement and the other Loan Documents and no Event of Default shall have occurred and be continuing at the time such Advance is requested or made and no Event of Default shall occur or result from the making of such Advance.

(3) Information and Loan Documents.  Each Credit Party shall have executed and/or delivered to Lender all documents, information, certifications and warranties as Lender may require in connection with such Advance, all properly executed and delivered, as applicable, and each in form and substance satisfactory to Lender.

(4) Advance Request.  Borrower (or someone acting on Borrower's behalf) shall have requested such Advance using such method and in such format as may be approved by Lender from time to time.

(5) Warranties and Representations.  All warranties and representations contained in this Agreement and the other Loan Documents shall be true and correct at the time such Advance is requested and made.

Each of Borrower's requests for an Advance constitutes a representation and warranty that no Event of Default exists under this Agreement or the other Loan Documents and that all conditions precedent to the making of such Advance have been satisfied.  The making of any Advance, even if one or more conditions precedent are not satisfied with respect to such Advance, shall not constitute any waiver on the part of Lender to require that all conditions precedent be satisfied with respect to any other Advance.

4. **DEMAND.  BORROWER ACKNOWLEDGES AND AGREES THAT THE ADVANCES MADE PURSUANT TO THE LOAN DOCUMENTS AND ALL OTHER OBLIGATIONS ARE DUE AND PAYABLE ON DEMAND AND THAT LENDER MAY MAKE DEMAND FOR PAYMENT OF SUCH OBLIGATIONS AT ANY TIME, WITH OR WITHOUT THE OCCURRENCE OF ANY OTHER FACT, CIRCUMSTANCE, OR CONTINGENCY AND FOR ANY REASON. BORROWER AGREES TO PAY ALL OBLIGATIONS ON THE EARLIER TO OCCUR OF (A) THE DATE ON WHICH LENDER DEMANDS PAYMENT AND (B) THE MATURITY DATE.**

5. **CERTAIN FEES.**  As consideration for Lender's agreement to make Advances on the terms and conditions set forth herein, Borrower agrees to pay Lender the Loan Origination Fee and the Servicing Fee.  The Loan Origination Fee and the Servicing Fee shall be due and payable on the date on which the first Advance is available under this Agreement. Borrower authorizes and directs Lender to make an Advance hereunder and to apply the proceeds of such Advance to the payment of the Loan Origination Fee and the Servicing Fee, each of which, once paid, shall be non-refundable, in whole or in part.

6. **WARRANTIES AND REPRESENTATIONS.**  Borrower makes to Lender each of the following warranties and representations which will continue until Payment in Full.

   A. **Power.**  Each Credit Party is organized, validly existing, qualified, and in good standing in each jurisdiction in which it operates. Each Credit Party has the power and authority to execute and deliver the Loan Documents to which it is a party and to perform its obligations thereunder.  Each Credit Party has the power and authority to carry on its business and activities as they are now being conducted.

   B. **Authority.**  The execution and delivery of this Agreement and the other Loan Documents by each Credit Party, as applicable, and each Credit Party's performance of its obligations under this Agreement and the other Loan Documents to which it is a party, have been duly authorized by all requisite action, have received all necessary governmental approval, will not violate any provision of law or order of any court or government or authority, and will not violate any agreement to which such Credit Party is a party or to which such Credit Party or any of its property is subject.

   C. **Name and Place of Business.**  Other than previously disclosed in writing to Lender, no Credit Party has changed its name or principal place of business within the last five years and has not used any trade or fictitious name other than its true legal name.  Without Lender's prior written consent, Borrower will not use any trade or fictitious name and will preserve its existing legal name and franchises.

   D. **Environmental Laws.**  Each Credit Party is in full compliance with all environmental and related laws, rules, and regulations.  Borrower does not know and has not reason to know that any hazardous substance or materials have been discharged, leached or disposed of, in violation of any environmental law.  Borrower has no knowledge or reason to believe that there is any investigation, claim, judgment or order, violation, Lien, or other notice under any environmental law which is pending or threatened and that concerns any Credit Party or any property owned or operated by any Credit Party.

   E. **Application.**  All information and statements made in any Application relating to this Agreement or the Advances made hereunder where true and complete in all material respects on the date on which such Application was delivered to Lender.  Borrower's operations and activities comport in all respects with the information Borrower provided on the Application with respect to the intended acres, intended harvest use, crop mix, and crop insurance type and levels, except to the extent otherwise agreed in writing by Lender.

   F. **No Other Liens.**  Borrower owns or leases all property that it needs to conduct its business and activities.  Borrower has good and marketable title to all property that it purports to own and a valid leasehold interest in all property it purports to lease.  All of Borrower's Property is free and clear of all Liens other than Permitted Liens.

   G. **Compliance With Laws.**  No Credit Party is in violation of any laws, regulations, rules, orders, judgments or decrees applicable to such Credit Party or any of its property, except for those which such Credit Party is challenging in good faith through proper proceedings and after providing adequate reserves to fully pay any such claim and its challenge should such matter be resolved against such Credit Party.

   H. **Legal Dispute.**  There are no pending or threatened law suits, arbitrations or other proceedings against any Credit Party or any of its property that relate to the transactions contemplated in the Loan Documents or that, singly or together, may materially and adversely affect such Credit Party's property, operations, financial condition, or

business.

**I.** **Adverse Agreements.** No Credit Party is a party to, nor is any Credit Party bound by, any agreement that is now or is likely to become materially adverse to such Credit Party's property, operations, financial condition, or business.

**J.** **Other Claims.** Each Credit Party's execution and delivery of, and its performance of its obligations under, the Loan Documents to which it is a party do not conflict with the terms of any other agreement, order, judgment, or decree to which such Credit Party is a party or by or to which any of its property is subject or bound and will not result in any Lien on such Credit Party or any of its property other than Permitted Liens.

**K.** **Certification.** Each and every financial statement that any Credit Party provides Lender fairly represents such Credit Party's financial condition for the periods stated in such statement, is current, complete, true and accurate in all material respects, includes all of such Credit Party's direct and contingent liabilities and there has been no material adverse change in such Credit Party's financial condition, operations or business since the date of such financial statement.  All information provided to Lender by any Credit Party shall be true and accurate in all respects when provided, when considered in the light of the reason for which such information was provided.

**7.** **FINANCIAL STATEMENTS AND INFORMATION.**  Borrower agrees to:

**A.** Prepare and maintain financial records using accounting principles and methods consistently applied;

**B.** Promptly (and, in any event, within three Business Days after Lender's request therefor) provide Lender with any and all other information about each Credit Party's operations, financial affairs, and condition which Lender may request from time to time, in each case, in such form as Lender may require from time to time.

**8.** **COVENANTS.** Until Payment in Full, Borrower will comply with the following terms (except to the extent waived in writing by Lender):

**A.** **Inspection, Information, and Appraisals.**

(1) Upon reasonable notice (or if any Event of Default exists, without prior notice), Borrower will permit Lender or Lender's agents to enter any of Borrower's premises, any premises which Borrower's leases, occupies, or otherwise operates, and any location where any Collateral is located so Lender may inspect any and all Collateral and inspect, audit, check, review and copy Borrower's books, records, journals, orders, receipts, and correspondence and any and all other business related data and information.

(2) Lender may discuss Borrower's affairs, finances and business with any Person which provides Lender with any evidence that such Person is a creditor of a Credit Party and any Person which Lender believes to be a creditor of Borrower.

(3) Lender (or its agents or representatives) may from time to time, with or without notice to Borrower inspect, audit, examine, appraise, or evaluate any and all of Borrower's assets and properties (real or personal) and do all other things which Lender believes is necessary or desirable to preserve and protect any of such assets or properties and Lender's interest therein.

(4) Borrower agrees to promptly (and, in any event, within three Business Days after Lender's request therefor) provide any and all information relating to Borrower, its business, its financial condition, and the Collateral as Lender may request from time to time.

(5) Lender may discuss Borrower's financial condition and business operations with each Credit Party and Borrower's independent accountants, auditors, and advisors, if any, and each Credit Party's officers, managers, directors, and members without further consent from any other Credit Party.  Until Payment in Full, Borrower shall, and shall cause each Credit Party to, direct all of its accountants and auditors to permit Lender to examine such Credit Party's records in their possession and to make copies of such records, all without further consent from any Credit Party.

(6) Promptly upon (but, in any event, within three Business Days after) Lender's request therefor, Borrower shall cause a responsible officer, member, or manager or its independent accountant to provide Lender with a written certification that to the best of such Person's knowledge no Event of Default exists and that there exists no other action, condition or event which, with the giving of notice or lapse of time or both, would constitute an Event of Default.

(7) Lender may from time to time obtain one or more appraisals of the Collateral and all costs and expenses thereof shall constitute an Advance for all purposes under this Agreement and the other Loan Documents.

**B.** **Maintenance and Continuation of Business.**  Borrower will preserve and maintain its present existence and good standing in the jurisdiction where Borrower is organized and all of Borrower's rights, privileges and franchises.  Borrower will do all that is needed or required to continue its business or activities as presently conducted, by obtaining licenses, permits and bonds everywhere Borrower engages in business or activities or owns, leases or locates its property.  Borrower will obtain Lender's prior written consent before Borrower ceases its business or before Borrower engages in any new line of business that is materially different from Borrower's present business.  Borrower shall actively pursue and conduct its business of farming, agricultural, and related businesses until Payment in Full.

**C.** **Compliance with Laws.**  Borrower will not violate any laws, regulations, rules, orders, judgments or decrees applicable to Borrower or by which Borrower or any of its property is bound, except for those which Borrower is challenging in good faith through proper proceedings after providing adequate reserves to fully pay the claim and its appeal should such matter be decided against Borrower.  From time to time, Borrower shall provide Lender with

written evidence that Borrower has fully and timely paid all of its taxes, assessments and other governmental charges (including, without limitation, sales taxes, use taxes, personal property taxes, documentary stamp taxes, recordation taxes, franchise taxes, income taxes, withholding taxes, FICA taxes and unemployment taxes) levied or imposed on Borrower or its property. Borrower will adequately provide for the payment of such taxes, assessments and charges that have accrued but are not yet due and payable.

**D. Fundamental Changes; Dispositions.** After the date of this Agreement and until Payment in Full, (I) Borrower will not merge, consolidate, or amalgamate with any other Person; (ii) Borrower will not acquire all or substantially all of the assets of any other Person or any line or division of any other Person; (iii) Borrower will not form or acquire any subsidiary or acquire through any means any or all of the debt or equity interests issued by any other Person; and (iv) Borrower will not sell, lease, transfer, or otherwise dispose of any of its property, except for the sale of inventory in the ordinary course of business (but subject to all other terms of the Loan Documents).

**E. Dealings with Insiders.** Borrower will not purchase, acquire, or lease any property or services from, or sell, provide or lease any property or services to, or borrower money from, or loan money to, or otherwise deal with, any of its officers, directors, shareholders, members, partners, or affiliates except as required under contracts which existed at the time Borrower submitted the Application and which were approved by Lender or as this Agreement otherwise permits. Borrower will not permit any of such contracts to be amended, in whole or in party, without Lender's prior written consent.

**F. Other Liabilities and Guarantees.** Borrower will not incur, assume or permit any debt for borrowed money or debt evidenced by notes, bonds or similar obligations, except (I) debt in existence on the date of this Agreement and fully disclosed in writing to Lender; (ii) debt subordinated in payment to Lender on conditions and terms acceptable to Lender; accounts payable incurred in the ordinary course of my business and paid under customary trade terms; and (iii) the Obligations. Borrower will not guaranty or become liable in any way as surety, endorser (other than as endorser of negotiable instruments submitted for collection in the ordinary course of business) or accommodation endorser or otherwise for the debt or obligations of any other Person other than in favor of Lender or as Lender otherwise specifically agrees in writing.

**G. Notices.** Borrower will promptly (and, in any event, within three Business Days after obtaining knowledge thereof) notify Lender of (I) any material change in any Credit Party's financial condition; (ii) the occurrence of any default or event of default under any debt owed by any Credit Party to any other Person; (iii) the occurrence of any Event of Default and Borrower's intentions in dealing with such Event of Default; (iv) the commencement or threatened commencement of any litigation, investigation, or proceeding against any Credit Party; (v) any damage to any Collateral; (vi) any notices from any insurance providers, agents, or underwriters relating in any way to any Collateral; (vii) any change (of any extent or nature) in the types of crops, acreage, irrigation, crop mix, or harvested use from those items as set forth in the Application; and (viii) any other fact or circumstance concerning any Credit Party which may adversely affect such Credit Party's property, operations, financial condition or business or its ability to perform its obligations under any Loan Document to which it is a party.

**H. List of Purchasers, Commission Merchants, and Others.** Borrower will furnish Lender with a current and accurate list of any and all potential or intended purchasers, cooperatives, commission merchants, selling agents, brokers, dealers and any other Persons to or through which Borrower may sell or otherwise dispose of all or any part of the Collateral, including, the full name, current mailing and business address and telephone numbers of such persons or entities. Borrower shall provide such lists to Lender by certified mail, to be received by Lender no later than the earlier to occur of the date which is five Business Days after the date of this Agreement and 180 calendar days before any such sale or other disposition of the Collateral, and Borrower will not sell or arrange for the sale of or otherwise dispose of or arrange for the disposition of any of the Collateral, or enter into any contracts in respect thereof, with any Person as to which Borrower has not complied with the notice provisions of this paragraph. Borrower will not store or arrange for the storage of, or enter into any contracts for the storage of, any Collateral with any Person other than Borrower, unless Borrower has first provided notice thereof to Lender. If any of the Collateral is located or placed in a warehouse, elevator, or similar facility, Borrower shall immediately deliver to Lender any and all warehouse receipts and other documents evidencing ownership of such Collateral, whether the same may be issued in negotiable or non-negotiable form. No purchaser of the Collateral or any cooperative marketing association, warehouseman or purchaser of warehouse receipts will ever be deemed to be the agent of Lender. No payment made to Borrower by any purchaser, cooperative marketing association, or purchaser of warehouse receipts will ever be construed to be payment to Lender or to operate as a release of Lender's security interest under the Loan Documents, except to the extent such payment is actually made to Lender and applied to reduce the Obligations.

**I. Use of Proceeds.** Borrower will use the proceeds of Advances only for planting, producing, and harvesting crops and such other purposes as may be authorized by Lender from time to time (each an "Authorized Purpose"). Borrower shall not use any of the proceeds of any Advance for any purpose other than an Authorized Purpose. Without limiting the generality of the foregoing, Borrower shall not plant, grow, cultivate, harvest, store, process, manufacture, or sell any crop consisting of marijuana or any product derived from marijuana. Borrower shall not permit the proceeds of any Advance to be used directly or indirectly to purchase, carry, reduce, or retire any loan originally incurred to purchase or carry any margin stock or otherwise permit the proceeds of any Advance in violation of Federal Reserve Board Regulations U or X, or Section 8 of the Securities and Exchange Act of 1934 and its regulations, as amended, or to pay the principal or interest of any other indebtedness. Borrower agrees that it shall use the proceeds of the Advances only for Authorized Purposes in direct furtherance of its business as provided herein and shall not use any

of the proceeds of any Advance for personal, family, or household purposes.

**J.**   **Payments to Third Parties.**  Lender reserves the right at any time and for any reason upon written notice to Borrower to pay Advances directly to any landlord, supplier, vendor, or creditor of Borrower.  If Lender makes such election, Borrower agrees to execute and furnish any documents, authorizations, or acknowledgements reasonably requested by Lender.

**K.**   **No Other Liens.**  Borrower will not create, permit or suffer to exist any Lien on any of the Collateral other than Permitted Liens.  From time to time, Lender may require Borrower, and Borrower agrees, to provide evidence of payment to Borrower's landlords, suppliers, vendors, or creditors and furnish such other documentation from any such landlords, suppliers, vendors, or creditors, including, without limitation, estoppel certificates, to evidence and confirm payment.

**L.**   **Restricted Payments.**  Borrower will not (i) make any dividends or distributions to its equityholders, or redeem, retire, purchase or otherwise acquire, directly or indirectly, any of its equity interests; or (ii) take any action the intent or effect of which is to circumvent the foregoing restrictions.

**M.**   **Insurance.**  Until Payment in Full, Borrower shall, at its sole cost, keep the Collateral and all of its other property insured against loss by fire, by hazards included within the term "extended coverage," and by such other hazards (including flood insurance where applicable) as may be required by Lender.  Insurance on Borrower's crops and farm products (and inventory to the extent applicable) shall be in an amount not less than the anticipated market value of such commodities or such other amount or amounts as Lender may approve in writing. Insurance on other Collateral shall be in an amount not less than the full replacement value of the Collateral, or such other amount or amounts as Lender may require or approve in writing. Borrower shall further provide and maintain, at its sole cost and expense, comprehensive public liability insurance, naming both Borrower and Lender as parties insured, protecting against claims for bodily injury, death and/or property damage arising out of the use, ownership, possession and operation and condition of the Collateral and the property on which the Collateral is located and further containing a broad form contractual liability endorsement covering Borrower's obligations to indemnify Lender as provided hereunder. In addition, Borrower shall obtain, at its expense, such federal or state crop insurance as may be required by Lender. Borrower may purchase such insurance from any insurance company or broker that is reasonably acceptable to Lender. All insurance policies, including renewals and replacements, must also be in form and substance acceptable to Lender and must additionally contain a lender's loss payable or other endorsement in favor of Lender, providing in part that (I) all proceeds and returned premiums under such policies of insurance will be paid directly to Lender or its assignees and (ii) no act or omission on the part of Borrower, or any of its officers, agents employees, or representatives, nor breach of any warranty contained in such policies, shall affect the obligations of the insurer to pay the full amount of any loss to Lender. Such policies of insurance must also contain a provision prohibiting cancellation or the alteration of such insurance without at least 30 days prior written notice to Lender of such intended cancellation or alteration. Borrower agrees to provide Lender with originals or certified copies of such policies of Insurance. Borrower further agrees to promptly furnish Lender with copies of all renewal notices and, if requested by Lender, with copies of receipts for paid premiums. Borrower shall provide Lender with originals or certified copies of all renewal or replacement policies of insurance no later than 15 days before any such existing policy or policies should expire. If Borrower's insurance policies and renewals are held by another person, Borrower agrees to supply original or certified copies of the same to Lender within the time periods required above.  Borrower agrees to immediately notify Lender in writing of any material casualty to or accident involving the Collateral, whether or not such casualty or loss is covered by insurance. Borrower further agrees to promptly notify Borrower's insurance company and to submit an appropriate claim and proof of loss to the insurance company if any Collateral is lost, damaged, or destroyed as a result of an insured hazard.  Lender may submit such a claim and proof of claim to the insurance company on Borrower's behalf, should Borrower fail to do so promptly for any reason. Borrower hereby irrevocably appoints Lender as its agent and attorney-in-fact, such agency being coupled with an interest, to make, settle and adjust claims under such policy or policies of insurance and to endorse the name of Borrower on any check or other item of payment for the proceeds thereof; it being understood, however, that unless one or more events of default exist under this Agreement, Lender will not settle or adjust any such claim without the prior approval of Borrower (which approval shall not be unreasonably withheld).  Lender shall have the right to directly receive the proceeds of all insurance protecting the Collateral and shall have the right to assign any such right to another Person, and so on. If Borrower should receive any such insurance proceeds, Borrower agrees to immediately hold such insurance proceeds in trust for the benefit of Lender or its assignees and to immediately turn over and to pay such proceeds directly to Lender or its designee or assignee. All such insurance proceeds may be applied, at Lender's sole option and discretion, in such manner as Lender determines (after payment of all reasonable costs, expenses and attorney's fees necessarily paid or fees necessarily paid or incurred by Lender in this connection) for the purpose of (I) repairing or restoring the lost, damaged or destroyed Collateral or (ii) reducing the then outstanding balance of the Obligations in whatever order Lender may determine.  Lender's (or its designee's or assignee's) receipt of such insurance proceeds and the applications of such proceeds as provided herein shall not, however, affect Lender's Liens on the Collateral. Nothing under this section shall be deemed to excuse Borrower from its obligations to promptly repair, replace, or restore any lost or damaged Collateral, whether or not the same may be covered by insurance, whether or not such proceeds of insurance are available, and whether such proceeds are sufficient in amount to complete such repair, replacement or restoration to the satisfaction of Lender.  Furthermore, unless otherwise confirmed by Lender in writing, the application or release of any insurance proceeds by Lender (or its designee or assignee) shall not be deemed to cure or waive any Event of Default.  Any proceeds which have not been disbursed

within six months after their receipt and which Borrower has not committed to the repair or restoration of Collateral shall be used to repay the Indebtedness. Any and all awards or damages received by Borrower from any governmental authority covering any of the Collateral shall further be paid to Lender and applied to the outstanding Obligations in whatever order Lender may determine. Should Borrower for any reason fail to maintain insurance on the Collateral as required under this Agreement, then Lender shall have the right again at Lender's sole option and discretion and without any responsibility or liability to do so, to purchase such insurance on Borrower's behalf, including without limitation, the right to purchase insurance protecting only Lender's rights and interests in the Collateral, and the costs of doing so shall constitute an Advance for all purposes of this Agreement and the other Loan Documents.

**N.  Property Maintenance.**  Borrower will keep all tangible and intangible property that is necessary or useful to the conduct of its business in good working condition by making all needed repairs, replacements and improvements and by making all rental, lease or other payments due on this property.

**O.  Farming Practices; Crop Mix, Acreage, Etc.**  Borrower shall not conduct its farming operations and business in any manner which could reasonably be expected to void any policy of insurance relating to any of the Collateral or provide any provider of such insurance any defense to paying any claim under such insurance. Borrower agrees to conduct its farming operations and business in a manner consistent with all requirements relating to any applicable state, local, or federal crop insurance program. Borrower will plant, grow, and harvest the crops in a manner that wholly comports with the information provided by Borrower in the Application, including, without limitation, the types of crops, crop mix, the acreage of each type of crop, the location of each type of crop, whether such crops are to be irrigated or not, and the intended harvest use of such crops.

**P.  Restriction on Date of Sale of Certain Collateral.**  Without Lender's prior written consent, Borrower will not enter into a sales contract or other contract for the disposition of any of its crops which constitute or intended to constitute Collateral if the date of sale provided for therein is after the Maturity Date.

**Q.  Deemed and Additional Advances.**  In addition to any other Advances made or deemed made under this Agreement or any other Loan Document, Borrower agrees that (I) if any Obligations are not paid when the same become due and payable, Lender may make a deemed Advance to pay such Obligations; (ii) if Borrower for any reason fails to pay taxes, assessments, or other governmental charges when due, or if Borrower fails to repair, maintain, tend, irrigate, cultivate, or harvest the Collateral as required under this Agreement or the other Loan Documents, then Lender shall have the right, at Lender's sole option and without responsibility to do so, to make one or more Advances to remedy the same; (iii) if any Credit Party defaults under any other loan or extension of credit secured by the Collateral, or if any of the Collateral becomes subject to or threatened with seizure or sale, then Lender shall have the additional right, at Lender's sole option and discretion and without any responsibility to do so, to cure such defaults or to cause such defaults to be cured, whether by making payments on such Credit Party's behalf or by taking such other actions as Lender deems necessary within its sole discretion and all payments, fees, costs, and expenses incurred or paid by Lender shall constitute an Advance. All Advances made or deemed made under this paragraph shall constitute an Advance for all purposes under this Agreement and the other Loan Documents.

**R.  Credit Reports.**  Borrower authorizes Lender (and any of its agents and representatives) to obtain, from time to time until Payment in Full, Borrower's personal and business credit profile or credit report (or similar report) from any one or more national or regional credit bureaus and Borrower ratifies and approves any actions taken by Lender before the date hereof in obtaining such.

**S.  Sale of Collateral and Payments Held in Trust.**  All proceeds of any sale, consignment, or transfer of Collateral shall be made immediately available to Lender in a form jointly payable to Borrower and Lender and all accounts receivable and other non-cash proceeds shall be endorsed, assigned and delivered to Lender for application to the Secured Obligations. In the event Borrower receives any payment of money to which Lender is entitled, whether singly or jointly with Borrower and/or any third party, Borrower shall receive and hold such sum in trust for the benefit of Lender and, without necessity for notice from or demand by Lender, immediately pay to Lender (or its designee) the entire sum received or such other sum as may be required by Lender in connection with such payment.

**9.  EVENTS OF DEFAULT. BORROWER ACKNOWLEDGES AND AGREES THAT THE OBLIGATIONS ARE DUE AND PAYABLE ON DEMAND. THE FOLLOWING EVENTS OF DEFAULT ARE INCLUDED SOLELY FOR THE PURPOSES OF AIDING LENDER IN THE ADMINISTRATION OF THE TRANSACTIONS CONTEMPLATED HEREIN AND DO NOT CONSTITUTE ANY ACTUAL OR IMPLIED PROMISE ON THE PART OF LENDER THAT PAYMENT OF THE OBLIGATIONS WILL NOT BE DEMANDED, EVEN IF NO EVENT OF DEFAULT EXISTS.** Each of the following shall constitute an "Event of Default":

**A.  Payments.**  Any Credit Party shall fail to make any payment of any Obligation when the same shall become due and payable.

**B.  Insolvency or Bankruptcy.**  Any Credit Party shall die or be declared incompetent; dissolve; become insolvent; cease conducting a material portion of its business; take any action in furtherance of the appointment of any receiver or have any receiver appointed with or without its consent; take any action in furtherance of making application under or commencing any proceeding any debtor relief, bankruptcy, or insolvency law; take any action in furtherance of any assignment for the benefit of its creditors; or have filed against it any involuntary proceeding under any bankruptcy law.

**C.  Change in Ownership.**  After the date of this Agreement, there shall be any change in the ownership of the Borrower

(in terms of the identity of each of Borrower's equity holders and the percentages of such equity interests owned by each such holder).

**D.    Failure to Perform.**  Any Credit Party shall fail to perform any covenant or agreement set forth in any Loan Document.

**E.    Use of Proceeds for Unauthorized Purposes.**  The use of any proceeds of an Advance for any purpose other than an Authorized Purpose.

**F.    Other Loan Documents.**  Any party to any other Loan Document (other than Lender) shall be in default of its obligations or covenants thereunder.

**G.    Other Agreements.**  Any Credit Party shall be in default of its obligations or covenants under any other document, instrument, or agreement with Lender.  Any Credit Party shall fail to pay any other debt it may owe when the same shall have become due and payable.

**H.    Misrepresentation.**  Any representation or warranty made by any Credit Party in any Loan Document shall be untrue or inaccurate in any material respect or shall conceal a material fact, in each case, at the time when such representation and warranty is made or deemed made.

**I.    Judgment.**  Any judgment, fine, or penalty shall be assessed or entered against any Credit Party in an amount in excess of $5000.

**J.    Forfeiture.**  Any Collateral or other property of Borrower is used in a manner or for a purpose that threatens confiscation by a legal authority.

**K.    Property Value.**  Lender determines in good faith that the value of the Collateral has declined or is impaired.

**L.    Insecurity.**  There shall occur after the date of this Agreement any fact or circumstance relating to any Credit Party which Lender believes, in good faith, is likely to have a material adverse effect on the business or financial condition of such Credit Party, the ability of such Credit Party to perform its obligations under the Loan Documents to which it is a party, the likelihood of Lender's ability to be repaid under the Loan Documents, or the value of the Collateral.

**M.    Revocation of Any Guaranty.**  Any Credit Party shall assert that this Agreement or any other Loan Document (including, without limitation, any guaranty of all or any portion of the Obligations) that it is no longer bound by such Loan Document or is not enforceable against such Person or any guarantor shall revoke or attempt to revoke any guaranty agreement.

**N.    Death of a Guarantor.**  The death of Guarantor and Borrower's failure to provide a substitute guarantor reasonably acceptable to Lender within 30 days of the death of Guarantor.

**O.    Inaccuracy in Application.**  Borrower's operations and activities at any time fail, for any reason, to comport in all respects with the information Borrower provided on the Application with respect to the intended acres, intended harvest use, crop mix, and crop insurance type and levels.

**10.  REMEDIES.**  During the existence of any Event of Default, Lender may, in its sole and absolute discretion, exercise any and all remedies it may have, whether arising under statute or rule, by contract, or in equity, whether against Borrower or any other Credit Party or the Collateral, all of which shall be cumulative and may be exercised singly or cumulatively, at one time or from time to time, including, without limitation:

**A.    Acceleration.**  Lender may declare all or any part of the Obligations Loan to be immediately due and payable, in which case, such Obligations shall be immediately due and payable; provided, however, that the Obligations shall automatically become immediately due and payable upon the occurrence of any Event of Default arising because of the commencement of any insolvency, bankruptcy, receivership, or similar proceeding.

**B.    Insurance Benefits.**  Lender may make a claim for any and all insurance benefits or refunds that may be available to any Credit Party.

**C.    Termination.**  Lender may terminate Borrower's rights to obtain advances or other extensions of credit by any of the methods provided in this Agreement.

**D.    Set-Off.**  To satisfy any or all of the Obligations, Lender may set-off against any amounts Lender may owe to Borrower.

**E.    Other Loan Documents.**  Exercise any or all of the remedies set forth in any other Loan Document.

**11.  INDEMNIFICATION; REIMBURSEMENT OF EXPENSES.**  Borrower agrees to defend, protect, indemnify, and hold harmless Lender and its affiliates and all of their respective officers, directors, employees, attorneys, consultants, and agents from and against any and all losses, damages, liabilities, obligations, penalties, fines, taxes, fees, costs, and expenses (including, without limitation, attorneys' fees, costs and expenses; fees, costs and expenses for investigations, experts, and advisors; all filing and recording costs and fees, including any recordation, documentary or transfer taxes or stamps, that are required to be paid with respect to the Obligations or any of the Loan Documents or the enforcement or protection of Lender's rights under the Loan Documents) incurred by or on behalf of such indemnitees, whether before or after the date of this Agreement, as a result of or arising from or in any way relating to the Loan Documents, the making of any Advance, the use of the proceeds of any Advance, or the transactions contemplated herein or in any other Loan Documents or the exercise of Lender's remedies hereunder or at law or in equity.  Borrower's obligations under this section shall survive Payment in Full.

**12.  APPLICABLE LAW; WAIVER OF JURY TRIAL.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE DEEMED CONTRACTS MADE UNDER THE LAWS OF THE JURISDICTION AND SHALL BE GOVERNED BY**

AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE JURISDICTION (EXCLUDING ITS CONFLICT OF LAWS PROVISIONS IF SUCH PROVISIONS WOULD REQUIRE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION) EXCEPT INSOFAR AS (A) THE LAWS OF ANOTHER JURISDICTION MAY, BY REASON OF MANDATORY PROVISIONS OF LAW, GOVERN THE PERFECTION, PRIORITY, OR ENFORCEMENT OF SECURITY INTERESTS IN THE COLLATERAL OR (B) THE TERMS OF SUCH LOAN DOCUMENT EXPRESSLY STATE THAT THE LAW OF A DIFFERENT JURISDICTION SHALL GOVERN.  ALL ACTIONS, SUITS OR PROCEEDINGS ARISING DIRECTLY OR INDIRECTLY HEREUNDER MAY, AT THE OPTION OF LENDER, BE LITIGATED IN COURTS LOCATED WITHIN THE JURISDICTION, AND BORROWER HEREBY EXPRESSLY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE JURISDICTION AND AGREES THAT ANY SERVICE OF PROCESS IN SUCH ACTION OR PROCEEDINGS MAY BE MADE BY PERSONAL SERVICE UPON BORROWER WHEREVER BORROWER MAY BE THEN LOCATED, OR BY CERTIFIED OR REGISTERED MAIL DIRECTED TO BORROWER AT BORROWER'S LAST KNOWN ADDRESS; PROVIDED, HOWEVER, THAT THE FOREGOING SHALL NOT PREVENT LENDER FROM BRINGING ANY ACTION, ENFORCING ANY LIEN OR JUDGMENT OR EXERCISING ANY RIGHTS OR REMEDIES AGAINST BORROWER OR ANY COLLATERAL OR OTHER PROPERTY OF BORROWER, WITHIN ANY OTHER COUNTY, STATE OR OTHER FOREIGN OR DOMESTIC JURISDICTION.  BORROWER WAIVES ANY OBJECTION TO VENUE AND ANY OBJECTION BASED ON A MORE CONVENIENT FORM IN ANY ACTION INSTITUTED UNDER THIS AGREEMENT.  TO THE MAXIMUM EXTENT OF THE LAW, EACH PARTY TO THIS AGREEMENT HEREBY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM CONCERNING THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT.

13. **SUCCESSORS AND ASSIGNS; AGENTS.**  This Agreement and each other Loan Document to which Borrower is a party shall be binding upon Borrower and Borrower's legal representatives, administrators, heirs and executors, and successors and assigns and shall inure to the benefit of Lender and its successors and assigns.  Borrower may not assign any of its rights or obligations under this Agreement or the other Loan Documents.  Lender may assign all or any portion of its rights under this Agreement or the other Loan Documents.  Lender may disclose to any actual or potential assignee any information Borrower has delivered to Lender in connection with this Agreement or the other Loan Documents.

14. **AMENDMENT, INTEGRATION AND SEVERABILITY.**  This Agreement may not be amended or modified by oral agreement.  No amendment or modification of this Agreement is effective unless made in writing and signed by Borrower and Lender.  This Agreement and the other Loan Documents are the complete and final expression of the agreement between Lender and Borrower regarding the subject matter hereof and thereof. If any provision of this Agreement is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

15. **NOTICE.** All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing and shall be effective upon receipt by the noticed party.  Acceptable methods for giving notices hereunder shall include first-class U.S. mail, hand-delivery, and nationally recognized commercial courier service.  Regardless of the manner in which notice is provided, notices may be sent to the addresses for Lender and Borrower as set forth below the applicable party's signature to this Agreement or to such other address as any party may give to any of the others for such purpose in accordance with this Agreement.

16. **FURTHER ASSURANCES.**  Borrower agrees to sign, deliver, and file any additional documents, agreements, instruments, or certifications that Lender may consider necessary or desirable to perfect, continue, and preserve the Obligations and Lender's rights with respect to the Collateral and to effect the transactions contemplated herein and in the other Loan Documents.

17. **CONFIDENTIALITY.**  Lender will endeavor to maintain the confidentiality of the information Lender or Lender's agents obtain with respect to Borrower, except that Lender may disclose such information (I) in any litigation, arbitration, or other proceeding involving any Credit Party, the Obligations, or the Loan Documents; (ii) to any of Lender's affiliates; (iii) to any government or governmental or regulatory agency and any self-regulating authority; (iv) to Lender's accountants, auditors, counsel, and advisors; (v) to any of Lender's actual or prospective assignees or participants; (v) as may be required by court order or law, rule, or regulation; (vi) to the extent permitted or contemplated under any Loan Document; and (vii) to any other Person whom Lender reasonably believes to be a creditor of Borrower or any other Credit Party.

18. **NO WAIVER.**  No failure or delay on the part of Lender to exercise any right under this Agreement or any other Loan Document or under applicable law shall operate as a waiver hereof or thereof nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

19. **SURVIVAL OF CERTAIN TERMS.**  All representations and warranties made in this Agreement and the other Loan Documents shall survive the making of any Advance and the delivery of any other Loan Document and shall continue in full force and effect until Payment in Full.

20. **COMMISSIONS.**  Borrower understands that Lender (or its affiliates) may earn commissions or fees on insurance products which may be made available to or provided to Borrower or any or all other Credit Parties.

21. **COUNTERPARTS; ELECTRONIC SIGNATURES.**  This Agreement and any amendments, waivers, or consents relating hereto may be executed in any number of counterparts and by different parties hereto or thereto in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument.  Any signature delivered by a party hereto or to any amendment, waiver, or consent relating hereto by facsimile transmission or by electronic email in Adobe Corporation's Portable Document Format (or PDF) shall be deemed to be an original signature hereto.

**22. ACCELERATION.**   Without limiting any other rights and remedies of Lender under applicable law or this Agreement, Lender may declare all or any part of the Obligations Loan to be immediately due and payable, in which case, such Obligations shall be immediately due and payable; provided, however, that the Obligations shall automatically become immediately due and payable upon the occurrence of any Event of Default arising because of the commencement of any insolvency, bankruptcy, receivership, or similar proceeding.

**23. EFFECT OF SIGNATURES.**   By signing, Borrower agrees to the terms set forth in this Agreement and certifies that Borrower has received a copy of this Agreement and that it has completely read and understands this Agreement.

**IN WITNESS WHEREOF**, Lender and each Borrower have executed and delivered this Agreement as of the date first above written:

**LENDER:**

**AGRIFUND, LLC**

**By:** _____

**Name:**

**Title:**

**Address for notices:**

420 Throckmorton Street, Suite 1100
Fort Worth, TX 76102

**EXHIBIT B**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| In re Colton and Stephnie Osborn, et al.,[1] | ) | Case No. 24-40202 |
| | ) | |
| Debtors. | ) | Chapter 12 |

**INTERIM ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR ORDERS (I)
AUTHORIZING POSTPETITION FINANCING; (II) GRANTING LIENS TO POSTPETITION
LENDERS; AND (III) SCHEDULING FINAL HEARING**

THIS MATTER COMES BEFORE THE COURT on *Debtors' Emergency Motion For Orders (I) Authorizing Postpetition Financing; (II) Granting Liens To Postpetition Lenders; And (III) Scheduling Final Hearing* seeking entry of interim and final orders under sections 105, 361, 364(c)(3) and 364(d)(1) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1 of the Nebraska Rules of Bankruptcy Procedure (the "Local Rules"): (a) authorizing, but not directing, Debtors to obtain postpetition financing on the terms set forth herein and (b) scheduling a final hearing on the Motion.

**FINDINGS[2],[3]**

A. On March 8, 2024 (the "Petition Date") Debtors filed voluntary petitions for relief under Chapter 12 of the Bankruptcy Code in this Court.

B. Debtors remain in possession of their assets and continues to operate as debtor-in-possession in accordance with 11 U.S.C. 1203.

C. A hearing on the Motion (the "Hearing") was held on _____, 2024.

D. The evidence presented to this Court at the Hearing indicates that Debtors require financing to operate for the 2024 crop season and that Debtors are unable to obtain financing on an unsecured basis. In addition, the evidence presented to this Court at the Hearing indicates that Debtors' proposed lender will not extend financing to Debtors unless such financing is approved under 11 U.S.C. §364(d) and is secured by a senior first lien position on the DIP Loan Collateral and subject to the terms of this Order.

E. The permission granted herein to use the Cash Collateral is necessary to avoid immediate and irreparable harm to Debtors. This Court concludes that entry of this Interim Order is in the best interest of Debtors' estate and creditors, as its implementation will, among other things, preserve the value of Debtors

---

[1] C&S Ag, LLC - Tax I.D. No. 83-4452293, C&S Organics, LLC – Tax I.D. No. 83-4444315, and Colton and Stephanie Orborn.

[2] Nothing herein constitutes a ruling or determination by this Court as to the allowance, validity, or enforceability of any claim, lien, or interest asserted by any party in these cases.

[3] Unless otherwise defined herein capitalized terms will have the meaning given to them in the Motion.

IN THE MATTER OF
Colton and Stephnie Osborn, et al.
Case No. BK 24-40202
Interim Order re Motion to Borrow

assets.

 F. Due and sufficient notice of the Motion has been given.

 G. Based upon the foregoing, good and sufficient cause exists to grant the Motion.

 Based on the foregoing, and upon the record of the Interim Hearing, it is hereby: ORDERED, ADJUDGED AND DECREED that:

 1. The Motion is granted on an interim basis. To the extent not withdrawn or resolved, all objections to the Motion are overruled.

 2. The Debtor is authorized to execute and deliver to ARM all documents and instruments which ARM shall deem necessary or advisable to establish a line of credit in an amount not to exceed Two Million, Six Hundred Thousand, Six Hundred Fourteen Dollars ($2,600,614.00) (the "New Line of Credit"); provided, however, that the amount of the New Line of Credit may be increased by 10% in the event such further extension of credit is necessary to continue or desirable to enhance farming operations in the ordinary course of Debtors' business without further order of the Court.

 3. ARM is authorized to make advances to or for the benefit of the Debtor under the New Line of Credit on the terms and conditions described in the Motion, the DIP Loan Agreements, and this Order.

 4. Any amounts funded by Arm under the DIP Loan Agreements shall be secured by a perfected senior, first position lien in the DIP Loan Collateral pursuant to 11 U.S.C. §364(d) (the "DIP Loan Liens").

 5. In the event that the proceeds from the DIP Loan Collateral are insufficient to pay all sums advanced by ARM in full, then ARM shall have an administrative expense claim in accordance with Section 364(c)(1), of the kind having priority over each administrative expense of the kind specified in Section 503(b) and Section 507(b); subject only to the carve-out agreed to by ARM for: (i) fees payable to the standing Chapter 12 Trustee; and (ii) the allowed and paid professional fees and disbursements incurred by Debtors in attorney fees and expenses to the Turner Legal Group, LLC in an amount not to exceed $65,000.00.

 6. The terms of this Order and the relief requested under the Motion shall survive entry of any Order modifying any plan, converting the case to a different chapter under the Bankruptcy Code, or dismissing this case, and the priority in payment, lien and security interest of ARM and/or assignee shall continue in full force and effect in this and any superseding case and/or subsequent to dismissal.

 7. This Order shall operate to perfect the DIP Loan Liens granted to ARM herein and pursuant to the Motion by operation of law. ARM shall not be required to file or record any financing statements, mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or to take any other action in order to perfect the l DIP Loan Liens granted by the Motion and approved and perfected by this Order. However, and to the extent necessary, the automatic stay imposed by 11 U.S.C. §362 is hereby modify so that: (i) Debtors may incur the liabilities, obligations, and liens contemplated by the DIP Loan Agreements and such additional extension of credit as may be necessary to plant, cultivate, or harvest 2024 crops in the ordinary course of business; (ii) Debtors may execute the DIP Loan Agreements and any other documents reasonably necessary to pledge the collateral securing the DIP Loan, including assignments of indemnity for crop insurance and assignments of payment for government payments; (iii) ARM may implement all of the terms, rights, and provisions granted by the DIP Loan Agreements, including

IN THE MATTER OF
Colton and Stephnie Osborn, et al.
Case No. BK 24-40202
Interim Order re Motion to Borrow

performing all acts to assure the perfection and first priority of its liens against the DIP Loan Collateral, including providing notice to buyers as provided by 7 U.S.C. § 1631;and (iv) ARM shall be immediately entitled to exercise all of its rights and remedies in respect of the collateral and default interest upon and after the occurrence of the earlier of the Maturity Date or an uncured Event of Default, as defined in the DIP Loan Agreements.

8.    The DIP Loan Agreements to be executed by the Debtors in connection with the New Line of Credit shall constitute the legal, valid and binding obligations of the Debtors' estates, enforceable in accordance with their terms

<u>Objections and Final Hearing</u>

9.    Any party seeking to object to entry of a final order approving the relief set forth in the Motion on a final basis must file a written objection (an "Objection") or before the Final Hearing as set forth below or any separate entry entered by the Court.

10.    A hearing to consider Debtors' request for final approval of the Motion and the use of Cash Collateral in accordance therewith shall be held before the undersigned on _____. prevailing Central Time (the "Final Hearing").  Parties intending to participate by telephone must dial into the AT&T TeleConference Center 5 minutes prior to the scheduled hearing at the toll-free number 1-888-684-8852, access code 5799715, security code 0804. The Court will not call the participants.

11.    Notwithstanding Rules 4001(a)(3), 4001(b)(1)(C), 6003, and 6004(h), the findings of fact and conclusions of law of this Court pursuant to this Order shall be deemed effective upon the entry of this Interim Order. To the extent that such findings may constitute conclusions, and vice versa, they hereby are deemed such.

12.    This Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation and interpretation of this Interim Order and to enforce the provisions of this Interim Order.

SO ORDERED THIS ___ DAY OF March, 2024

_____
Hon. Brian Kruse

Submitted By:
TURNER LEGAL GROUP, LLC
Patrick Turner (NE Bar No. 23461)
14707 California Street, #1
Omaha, Nebraska 68154
Telephone: (402) 690-3675
pturner@turnerlegalomaha.com

**Counsel for Debtors.**